UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------------------x
ENOCH KELLY HANEY,           :
                             :
        Plaintiff,           :
                             :
                             :
        v.                   : No. 1:05-cv-02501-JDB-JMF
                             :
MARRIOTT INTERNATIONAL,      :
INC,                         :
                             :
        Defendant.           :
----------------------------x

Washington, D.C.

Tuesday, May 8, 2007

Deposition of

FAWZI P. BAYAN

a witness, called for examination by counsel for Plaintiff pursuant to notice and agreement of counsel, beginning at approximately 10:58 a.m. at the law offices of Douglas & Boykin, PLLC, 1850 M Street, NW, Washington D.C., before Christine Allen of Beta Court Reporting, notary public in and for the District of Columbia, when were present on behalf of the respective parties:

Page 2

```
 1   APPEARANCES:
 2      On behalf of Plaintiff:
 3         CURTIS A. BOYKIN, ESQUIRE
            ROBERT DILLARD, ESQUIRE
 4         Douglas & Boykin, PLLC
            1850 M Street, NW, Suite 640
 5         Washington, D.C.  20036-5839
            (202) 842-1800
 6
        On behalf of Defendant
 7
           ROBERT LYNCH, ESQUIRE
 8         Maclay Lynch
            1629 K Street, NW, Suite 802
 9         Washington D.C.  20006
            (202) 785-0123
10
11                * * * * *
12
13
14
15
16
17
18
19
20
21
22
```

Page 3

```
 1              C O N T E N T S
 2   EXAMINATION BY:                         PAGE
 3      Counsel for Plaintiff                  4
 4   DEPOSITION EXHIBITS:
 5   No.  1 - Curriculum Vitae               11
 6   No.  2 - Testimony Log                  37
 7   No.  3 - CD with Pictures               62
 8   No.  4 - Notice of Deposition           63
 9   No.  5 - Standard F-462                 66
10   No.  6 - Standard F-1678                66
11   No.  7 - Slip Tester Operating Manual   66
12   No.  8 - Fall analysis                  66
13   No.  9 - Plaintiff Deposition           66
14   No. 10 - January 9, 2007, Notes         66
15
16                * * * * *
```

Page 4

```
 1              P R O C E E D I N G S
 2   Whereupon,
 3              FAWZI P. BAYAN
 4   was called as a witness and, having been first duly
 5   sworn, was examined and testified as follows:
 6         EXAMINATION BY COUNSEL FOR PLAINTIFF
 7   BY MR. BOYKIN:
 8      Q   Good morning.
 9      A   Good morning.
10      Q   My name is Curtis Boykin.  To my
11   left is my associate, Mr. Robert Dillard.
12   We're here for the deposition of
13   Mr. -- please correct me if I pronounce your
14   name wrong, sir -- Fawzi Bayan?
15      A   Correct.
16      Q   All right.  Could you spell your
17   name for the court reporter, please?
18      A   F-a-w-z-i -- first name.  Last
19   name, B-a-y-a-n.
20      Q   And by whom are you employed, sir?
21      A   SEA Limited.
22      Q   And what is their business address?
```

Page 5

```
 1      A   1110 Benfield Boulevard, Suite A
 2   through D in Millersville, Maryland  21108.
 3      Q   How long have you been employed
 4   with SEA?
 5      A   Since 1998.
 6      Q   What does SEA stand for?
 7      A   It doesn't stand for anything
 8   anymore.  It used to be the acronym for
 9   something, but that name was either taken by
10   someone else, and now we go by SEA Limited.
11      Q   All right.  Briefly, sir, what is
12   your occupation?
13      A   I'm an engineer.  I'm a principal
14   engineer at SEA, and I am the director of the
15   reconstruction group.
16      Q   How long have you been practicing
17   engineering?  First, let me just summarize
18   the question.  Could you give a brief
19   description of your background and
20   experience?
21      A   Sure.  I have a Bachelor of Science
22   from the University of Colorado, Boulder.  I
```

74

1 report, given that he signed it.
2    A    Well --
3    Q    And there was no prior drafts to
4 your knowledge.
5    A    I don't know, but he looked at it,
6 and obviously, he was satisfied with it.
7    Q    Can you tell me what specifically
8 he looked at?
9    A    No.
10   Q    Can you tell me, from the start of
11 your visual inspection of the tub to your
12 drafting of the report, how many hours of
13 time did you spend?
14   A    You want the whole thing or just
15 from -- you mean after I did the testing, or
16 are you talking about the whole thing?
17   Q    No, the testing as well.
18   A    The whole thing?
19   Q    Yes, sir.
20   A    Okay. I don't know exactly, but
21 I'm going to guess that -- not guess.
22   Q    Please don't guess.

75

1    A    I'm going to estimate that the
2 inspection itself took between
3 probably -- between travel and the
4 inspection, something like five hours, maybe
5 six.
6    Q    How much time was travel time?
7       I'm just looking --
8    A    Probably an hour each way or so.
9    Q    Okay.
10   A    Depending on traffic on that day.
11   Q    So we can say then three hours of
12 your inspection of the tub.
13   A    Three hours at the tub, maybe four,
14 three-and-a-half hours.
15   Q    What did you do during that three
16 hours?
17   A    What I said earlier: take pictures,
18 write notes, make measurements of the
19 traction.
20   Q    Okay.
21   A    Talked to people that were there
22 also.

76

1    Q    Who did you talk to?
2    A    I talked to the director of
3 maintenance. I talked to a safety person. I
4 talked to the cleaning crew.
5    Q    Okay.
6    A    I talked obviously with the
7 attorney. I think that's it.
8    Q    With respect to each of those
9 people you have identified, what did you
10 speak with the director of maintenance about?
11   A    Just generalities. Specifically, I
12 was interested in knowing about the tub,
13 whether it had been changed, whether it was
14 the same tub -- you know, things like that.
15 I also of course talked to her about blocking
16 that room, which is always an issue in a
17 hotel. So there was --
18   Q    What does that mean?
19   A    Well, making sure that we can have
20 the room to do the testing.
21   Q    I see.
22   A    You know, that's what I mean. You

77

1 know, not having the room assigned to
2 somebody while I was there.
3    Q    Sure.
4    A    That would have been a little bit
5 embarrassing, so -- you know, those kind of
6 details. Those are all I recall, offhand.
7    Q    I take it that the director of
8 maintenance gave you information orally?
9    A    Yes.
10   Q    He or she did not provide you with
11 any written documents?
12   A    No.
13   Q    All right.
14   A    Correct.
15   Q    You said that you also talked with
16 housekeeping?
17   A    There's a safety person, and I
18 don't remember his position, but we talked
19 about other falls and whether there had been
20 other falls at this place, and he said no.
21      I think the director of maintenance
22 may have said that, too. I had found that

Page 78

1  information. Housekeeping, there was a lady
2  there in the corridor that was cleaning
3  another room, so I talked to her about how
4  she cleaned the tubs.
5      Q   What did you ask her?
6      A   I asked her what the procedure was.
7      Q   What did she tell you?
8      A   She told me that they use a cleaner
9  and that they rinse everything off. I -- you
10 know, I acknowledged that procedure to be
11 appropriate, and that's it.
12     Q   Did she tell you anything else
13 about the type of cleaner used?
14         MR. LYNCH: Objection.
15         Go ahead.
16         THE WITNESS: She showed me what
17 she was using -- and I can't recall what it
18 is, but it was a typical commercial cleaner
19 that you would find for -- that you would use
20 in your house -- that I would use in my
21 house, excuse me.
22         And so nothing unusual, nothing

Page 79

1  specific. Just commercial cleaners available
2  off the shelf.
3          BY MR. BOYKIN:
4      Q   Did you inquire of her whether she
5  was the person who cleaned this particular
6  room that is the subject of this litigation?
7      A   No.
8      Q   Did you speak with the housekeeping
9  person who cleaned this particular room that
10 is the subject of this litigation?
11     A   No. I mean, I don't know. Maybe
12 she was, maybe she wasn't. So I --
13     Q   Did you inquire of her?
14     A   No. This accident occurred some
15 time back, so I would be very surprised if
16 somebody could pinpoint the person who
17 actually cleaned that bathroom on that day.
18 So no, I did not ask that question.
19     Q   Did you review any documents at all
20 that would explain to you what was done to
21 that room, on that particular day, with
22 regard to cleaning?

Page 80

1      A   No, I did not.
2      Q   In your inquiry with the
3  housekeeping person, did you inquire of her
4  the temperature of the water used when they
5  cleaned the tub?
6      A   She told me that she uses warm
7  water.
8      Q   What did you understand "warm
9  water" to mean?
10     A   Hot. I mean -- you know, water
11 that is hot enough as opposed to cold water.
12 Water that's used to clean any soap or any
13 residue.
14     Q   Did she demonstrate for you her
15 method?
16     A   I don't think she did. I asked her
17 what is the normal procedure for anybody who
18 cleans this, and that's what she told me.
19 And that was her -- she told me see, I use
20 this, this is what I do. I said okay.
21     Q   You mentioned a third person that
22 you spoke with. You said the safety person,

Page 81

1  the housekeeping person, and the director of
2  maintenance.
3      A   Correct.
4      Q   What did you inquire of the safety
5  person?
6      A   I think he's the one who made the
7  original arrangements to come on that day.
8  And so he met us, and he took us in room.
9  And the main thing I wanted to know was what
10 kind of -- if there had been falls at this
11 location, in this particular bathtub, by
12 other occupants at any time. And he told me
13 that he had no falls -- according to him. I
14 don't remember exactly, but that was the gist
15 of the conversation.
16     Q   Did you inquire of him how long he
17 had been employed there?
18     A   I think I did, and I think he had
19 been there for a while. But frankly, as I
20 sit here, I don't remember.
21     Q   Did you inquire of him whether
22 there were any written records you could

90

1 spent at least a couple of hours analyzing
2 this data. And then I spent another hour or
3 so looking at the various documents here. I
4 did look -- I also spent a few hours looking
5 at the deposition and the interrogatories.
6 And then I wrote the report -- so how long
7 does that take? I don't know.
8     Half a day, or maybe a little more.
9  Q  Okay. So --
10 A  Maybe a day. It varies. So --
11 Q  Did you submit a -- did --
12 A  So altogether, I would say, aside
13 from the testing which was five, six hours,
14 that probably was another day to two days'
15 worth of work.
16 Q  I want to be clear, though, because
17 we keep going back and forth on the testing.
18 You said that the day you made the
19 inspection, it involved about five hours,
20 with an hour, approximately, commuting each
21 way. So I'm assuming that we're talking
22 about a three-hour inspection.

91

1  A  Like I said, three to four, and a
2 total five to six for that day -- that's a
3 separate block.
4  Q  Right, that's a separate block.
5 And --
6  A  I was talking about the second
7 block now.
8  Q  Okay.
9  A  And afterwards, I analyzed the
10 data, I reviewed deposition and the
11 interrogatories, wrote the report. I'm sure
12 I talked on the phone with the attorney. I
13 looked at the standards. And so that may
14 have added another -- in addition to those,
15 another 10, 12, 14 hours -- I don't know.
16 Q  Okay. All right.
17 A  One to two days, somewhere in
18 there --
19 Q  Ten, fourteen hours?
20 A  Yeah.
21 Q  Can you tell me, sir -- your
22 inspection took place on January 9th, I

92

1 believe.
2  A  Correct.
3  Q  Your report was issued on
4 February 16th, and you spent a total of less
5 than 20 hours in total.
6  A  Correct. Yeah, I would think
7 that's about right.
8  Q  Can you tell me, sir, why it took
9 so long to issue this report?
10 A  That's the standard time for us.
11 We typically do an inspection and we have a
12 result -- typically a report -- within a
13 month, more or less a month to two months,
14 depends. So we don't -- you know, rush and
15 write a report. We have other cases we're
16 working on. Typically, we tell clients 3-5
17 weeks.
18 Q  I think you testified a moment ago
19 that you checked the standards last night to
20 make sure that they were still active
21 standards.
22 A  Correct.

93

1  Q  Would it surprise you to know that
2 F-1678 is no longer an active standard?
3  A  No, it doesn't surprise me.
4  Q  It doesn't surprise you?
5  A  No.
6  Q  Okay.
7  A  As I explained to you earlier, the
8 F-13 has withdrawn this equipment for the
9 purposes of this kind of -- not this testing
10 but these other tests, because of what I just
11 explained to you earlier about ASTM.
12 Q  Would it surprise you to know that
13 the standard was withdrawn in June of 2005?
14 A  No.
15 Q  But you still relied on the
16 standard as part of your opinion?
17 A  I just explained that I relied on
18 462. And 1678 was offered as part for
19 completeness. But what I need is in this
20 Exhibit 7, which provides me everything I
21 need in addition to 462 to give my analysis.
22 Q  So the truth of the matter is you

94

1  really did not rely on F-1678, inasmuch as
2  that particular standard had been withdrawn?
3     A  That's right.
4     Q  But you make no mention of that in
5  your report.
6     A  No, I do not. Because as I said, I
7  was listing the information that I looked at,
8  and that I relied upon. And I looked at
9  F-1678 as well as 462. Even though 1678 is
10 withdrawn, the equation in 1678 is still
11 valid, and is listed in Exhibit 7. So to
12 that extent, since I'm listing everything I
13 relied upon, I included that.
14    Q  I asked you about your
15 investigation, which included some of your
16 conversations with persons at the hotel --
17    A  Yes.
18    Q  And you don't list those folks
19 that -- for example, the basis of your
20 statement that the American Standards tub
21 installed in the 1990s did not change, and
22 this tub had no history of falls. You make

95

1  no mention of what your source of information
2  is with regard to that statement.
3        MR. LYNCH: Objection; asked and
4  answered.
5        Go ahead.
6        THE WITNESS: I listed that
7  information, but you're right, I did not list
8  who exactly I got it from, but that's part of
9  my investigation.
10       BY MR. BOYKIN:
11    Q  How is it, sir, that you checked
12 whether or not 1678 was an active standard
13 before the deposition, but did not discover
14 that it was withdrawn since June of 2005?
15    A  I knew that it was withdrawn, and
16 I've checked to make sure that everything was
17 still the way I remember it -- remember, I'm
18 part of the ASTM committees. So I knew that
19 1678 may have been withdrawn, and I just
20 wanted to make sure that I was correct. I
21 looked at F-462 and I saw that it was active,
22 which is also correct with -- or jibes with

96

1  my recollection, and I confirmed that 1678
2  was withdrawn.
3     Q  Sir, you said you're a member of
4  the ASTM -- one of the voting members.
5        Is that correct?
6     A  Correct.
7     Q  Do you vote on specific issues
8  regarding safety, such as slip-resistant
9  bathing surfaces?
10    A  If it comes for -- you know,
11 re-approval and things like that, yes, I
12 would.
13    Q  Are you familiar with the annex to
14 F-462?
15    A  Which annex?
16    Q  The annex to the standard itself.
17    A  You're talking about this document
18 here?
19    Q  It's labeled A1, step-by-step
20 operation of the NIST-Brungraber
21 slip-resistance tester.
22    A  Right. Yes.

97

1     Q  You're familiar with that?
2     A  Yes.
3     Q  Do you have it before you, sir?
4     A  Yes.
5     Q  Can you look at the bottom of the
6  page -- I think it's page number 7 --
7     A  Six -- is that what --
8     Q  Sir, let me see your -- yes, bottom
9  of page number 7, last page.
10    A  Oh, that page? I'm sorry.
11    Q  Yes, sir. The paragraph second
12 from the bottom, where it says, "This
13 standard is subject to revision at any time
14 by the responsible technical committee, and
15 must be reviewed every five years, and if not
16 revised, either re-approved or withdrawn."
17    A  Okay.
18    Q  Are you familiar with that
19 statement, sir?
20    A  I see it. Yeah, it's the standard
21 disclaimer that's in all ASTM standards.
22    Q  When was the last time this

122

1  A  For -- you know, the equipment
2  takes a certain amount of space --
3  Q  Right.
4  A  We have a certain length of tub.
5  So to make three measurements, you can do
6  one, two, three -- you know, and that's as
7  far as you can go on the tub on that
8  direction, and sideways similarly. I mean,
9  obviously you don't want to measure when the
10 angle on the side of the tub starts to be so
11 high and then -- you know, everything gets
12 mixed up, so you don't want that.
13 Q  How does the tester accommodate for
14 that limitation?
15 A  It only tests the floor of the tub.
16 It does not test the walls of the tub, nor
17 does it test -- you know, any of the vertical
18 surfaces on the tub.
19 Q  I'm assuming that this tub -- and
20 you inspected it -- has a curve at the bottom
21 of the tub that leads from the wall to the
22 floor. And visually depicted in your

123

1  drawings, there obviously is a wall on the
2  interior of the tub that leads from the wall
3  to the surface.
4  A  Right.
5  Q  This test is not applied to that
6  curved area, does it?
7  A  No. But indirectly, it does. I
8  mean, if you wanted to know the friction in
9  the curve area, what choice do you have but
10 to measure it on the floor? And since the
11 material is similar, you'd expect similar
12 results. So you're right, it's not made for
13 that, and all you can get from our test
14 results is an indication of what would be
15 elsewhere. But these test results are
16 primarily for the bottom horizontal surface
17 of the tub.
18 Q  Okay.
19 A  Nothing else.
20 Q  So then looking at Plaintiff's
21 Exhibit No. 8, which includes your photograph
22 of the surface of the tub, and from your

124

1  written report, you mention the
2  slip-resistance portion of the tub that's on
3  the floor of the tub.
4  A  Correct.
5  Q  Looking at the photograph, it does
6  not appear that this slip-resistant surface
7  extends to the curve of the tub, which is
8  just a curved portion connecting the floor to
9  the wall. Is that correct?
10 A  That's -- well, it ends, and it's
11 shown in my notes where it ends. So you're
12 right, it ends at some point. I don't know
13 the exact distance without looking at my
14 notes.
15 Q  And the machine itself can't get to
16 this particular area because of the dimension
17 of the tub, the limitation of its use --
18 A  Right.
19 Q  For measuring this particular
20 surface. Is that correct?
21 A  That's right. It measures -- in
22 this example here, it would be -- you know,

125

1  in this area, which may include a little bit
2  of the area that's without this -- the
3  friction material, but it's not going to go
4  all the way to the curved area.
5  Q  So can you say within a reasonable
6  degree of professional certainty, sir, that
7  if one's foot was in this area that does not
8  have the slip-resistant surface, that there
9  would be a different coefficient of friction
10 that would be applicable here?
11 A  It could be a different friction
12 coefficient. I would expect not, simply
13 in --
14 Q  In layman's terms, it could be more
15 slippery here than -- and when I'm saying
16 "here," I'm referring to the area that does
17 not have the slip-resistant surface versus
18 the area that does have the slip-resistant
19 surface.
20 A  Based on my experience and my
21 opinion, it would be similar, simply because
22 the -- you know, this part here was worn down

Page 126

1  essentially to what -- you'd have to touch it
2  to feel it, but it's essentially worn down
3  and gone. So what you're --
4     Q   When you're saying --
5     A   Measuring here -- let me finish, is
6  essentially similar to what would be
7  without -- in my opinion, based on my
8  testing.
9     Q   I see. So --
10    A   Although my results really apply
11 here and nowhere else.
12    Q   I'm just trying to help the record
13 out a little bit when you're using "here" and
14 "there" --
15    A   Okay.
16    Q   When we read this transcript later,
17 we're not going to understand what we're
18 talking about. That was my only reason for
19 interrupting.
20    A   Sure.
21    Q   I want to make sure that I have
22 this clear.

Page 127

1     If I understand your testimony,
2  it's that the portion of the tub that has the
3  visually identifiable slip-resistant surface
4  is worn down.
5     A   At the time of my testing.
6     Q   Right. And that you believe that
7  it's worn down in a manner that makes
8  it -- the coefficient -- I'm trying to use
9  layman's terms, but correct me if I'm
10 wrong -- you're saying that it would be no
11 slipperier -- the coefficient of friction
12 would not decrease in this portion of the tub
13 that does not have the slip-resistant
14 surface. There would be no difference in
15 your professional opinion between the surface
16 that has slip-resistant surfacing and the
17 portion of the tub that does not have
18 slip-resistant surfacing.
19    A   Given the condition of that
20 slip-resistant material on the day of my
21 test, I believe that would be appropriately
22 true, or that would be an appropriate

Page 128

1  statement; okay?
2     Q   Would that be the case with or
3  without soap being present?
4     A   With soap, just the way I've tested
5  it, or with water, the way I've tested it.
6     Q   If you look at F-62, in the annex
7  paragraph 81.2.2 -- can you reference that
8  paragraph?
9     A   Yes.
10    Q   Now, the discussion here talks
11 about the importance of the tester using the
12 apparatus to test in an uphill direction, as
13 we've discussed before; correct?
14    A   Yes. Well, in part -- yeah, I mean
15 discuss other things.
16    Q   In part. And that failure to do so
17 would require adjustment, recalibration, of
18 the apparatus itself. And in other words,
19 failure to operate the machine or the
20 apparatus correctly could give false
21 readings.
22       Is that correct?

Page 129

1     A   That's always true of any
2  equipments. I mean, that's --
3     Q   So --
4     A   But it doesn't relate to anything
5  we just talked about.
6     Q   I take it that the machine itself
7  then is a sensitive machine, is it not?
8     A   Well, you have to know how to
9  operate it, obviously.
10    Q   And obviously, you have testified
11 that you're qualified, and that you operated
12 properly in this case; correct?
13    A   Correct.
14    Q   And failure to operate it correctly
15 could give false readings.
16    A   That's why you do 18 readings, to
17 make sure -- you know, that's the whole idea
18 in science is repeatable test results. So
19 you do one, you do -- you get 1.2. You do
20 another one and you get 1.8, and you think,
21 oh, that's odd, it's so much different. So
22 you go back and do more. So the idea is to

### Page 142

1  MR. LYNCH: Objection.
2  Go ahead.
3  THE WITNESS: Well, I'm not sure
4  whether I understand what you mean. I mean,
5  cleaning products in this case if used
6  properly, which is to apply it and then rinse
7  it off, simply would make sure that the
8  surface goes back to a normal condition.
9  BY MR. BOYKIN:
10  Q  But in this case, based on what
11  you've reviewed -- well, first of all, the
12  accident occurred before you were brought on
13  to the scene. We know that.
14  A  Of course.
15  Q  And I think you testified earlier
16  that you did not review any records of what
17  treatments, cleaning or otherwise, had been
18  made to this particular tub specimen at the
19  time of Mr. Haney's fall; correct?
20  A  I don't think I said that.
21  Q  Well --
22  A  I said I -- that -- and talking to

### Page 143

1  the -- go ahead.
2  Q  Let me rephrase the question.
3  My question is, do you know what
4  cleaning products or other treatment was made
5  to the room at or before the time of
6  Mr. Haney's fall?
7  MR. LYNCH: Objection.
8  Go ahead.
9  THE WITNESS: My understanding is
10  what I said earlier, which is that the
11  procedure used by the hotel, as described to
12  me by the cleaning lady, is that they use a
13  commercial cleaning product, and then they
14  rinse it off --
15  BY MR. BOYKIN:
16  Q  Okay.
17  A  With warm water. And that is a
18  process by which these tubs are cleaned. So
19  my understanding is that that was a process
20  used at the time of Mr. Haney's presence at
21  the hotel.
22  Q  And your understanding of that is

### Page 144

1  solely from your discussion with the cleaning
2  lady on the date that you inspected the tub?
3  A  Well, the different people I talked
4  to. I mean, there was also the head of
5  maintenance, not to forget --
6  Q  Oh, the head of maintenance --
7  A  Right.
8  Q  Described for you the process by
9  which the rooms were cleaned?
10  A  She told me to talk to the cleaning
11  person --
12  Q  So that would be a no?
13  A  Who then described her -- the
14  experience of how it's done.
15  Q  So that would be a no to my
16  question. She did not describe for you
17  independently the process of the rooms being
18  cleaned.
19  A  Okay. That would be a no.
20  Q  In point of fact, sir, you reviewed
21  no records relating to the date of
22  Mr. Haney's fall which would give you further

### Page 145

1  information about what was done to that room.
2  A  That's true. I've reviewed no
3  records to that extent.
4  Q  You don't know whether that
5  cleaning lady that you spoke with was the
6  cleaning lady that actually cleaned
7  Mr. Haney's room, do you?
8  A  That's right. I do not know that
9  for a fact.
10  Q  You said you did not know what the
11  cleaning products are that the housekeeping
12  service uses on the tubs; correct?
13  A  She showed me the product, and I
14  recorded in my memory as being a commercial
15  product, off-the-shelf type of product. I
16  didn't --
17  Q  Was it an abrasive product, or
18  would you know --
19  A  I would describe it as a
20  window-type cleaning product.
21  Q  A window-type cleaning product?
22  A  Yeah, something to that effect.

146

1  Q  Not an abrasive product?
2  A  That's my best description for you,
3  based on what -- my recollection at this
4  moment.
5  Q  If, hypothetically speaking, the
6  tub was not properly cleaned and rinsed off,
7  and residue from the cleaning product was
8  left on the tub, would that change or
9  influence the coefficient of friction?
10      MR. LYNCH: Objection.
11      THE WITNESS: First of all, it's
12  inconsistent with what Mr. Haney said. He
13  said the conditions were usual. He didn't
14  say there was any residue, that he saw
15  anything like that. So we're purely in the
16  hypothetical realm --
17      BY MR. BOYKIN:
18  Q  Yes, sir. Yes, sir.
19  A  As far as I'm concerned. But
20  assuming that -- the chemical can change
21  traction, of course.
22  Q  It can make it more slippery, can

147

1  it not?
2  A  It could, yes.
3  Q  And that's even in the area where
4  there is a treated surface; correct?
5  A  Well, it depends on the amount of
6  residue. Everything depends -- it depends.
7  So --
8  Q  Would you agree with me that
9  residue is not always visible to the eye?
10      MR. LYNCH: Objection.
11      THE WITNESS: I don't know. It
12  depends on the chemical. It's possible.
13      MR. BOYKIN: I don't have any
14  further questions, Mr. Bayan. I do
15  appreciate your time and your cooperation.
16      THE WITNESS: Sure. Just wanted to
17  say, are you going to pay me now or are you
18  going to pay me later or -- what do you plan
19  to do with respect to that aspect?
20      MR. BOYKIN: Well, I'd appreciate
21  it if your counsel could put in writing the
22  charges --

148

1      MR. LYNCH: We will figure that
2  out.
3      THE WITNESS: Okay.
4      MR. BOYKIN: And we'll --
5      THE WITNESS: So we're talking
6  about an hour or 2 hours and 45 for today.
7  Is that all right as far as you're concerned?
8      MR. BOYKIN: I have to deduct the
9  water.
10      THE WITNESS: Deduct the water?
11  Then I guess I have to add travel. I don't
12  know what that is, but travel would be
13  probably an hour and a half.
14      MR. BOYKIN: We can go off the
15  record now.
16      THE WITNESS: No, I just would like
17  it on the record, just to be safe.
18      MR. BOYKIN: Well, you can talk
19  with Mr. Lynch about that, and we'll make
20  sure that whatever compensation you're due,
21  you will be paid, sir.
22      THE WITNESS: I'm just telling you

149

1  what it's going to be, which is 2 hours and
2  45 minutes, plus an hour and a half, plus
3  probably mileage.
4      Do you want copies of these CDs and
5  other things?
6      MR. BOYKIN: Sir, I would
7  appreciate a copy of the CD, sir.
8      THE WITNESS: Okay.
9      MR. BOYKIN: Those exhibits, I
10  would ask --
11      THE WITNESS: Be copied as well?
12      MR. BOYKIN: Ordinarily, I'd have
13  them stay with the court reporter and she
14  makes copies.
15      Is that going to be a problem for
16  you?
17      THE WITNESS: Well, I just want to
18  recover my originals, and so --
19      MR. BOYKIN: It wouldn't be a
20  problem.
21      THE WITNESS: That would be a
22  problem in that sense. I just don't want to,